```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
_____
                              )
UNITED STATES OF AMERICA,     )
                              )
              Plaintiff,      )
                              )      Criminal Action
v.                            )      No. 20-30008-PBS
                              )
DAVID CECCHETELLI,            )
                              )
              Defendant.      )
_____)
```

## MEMORANDUM AND ORDER

November 22, 2021

Saris, D.J.

### INTRODUCTION

Defendant David Cecchetelli is charged with being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). He moves to dismiss the indictment on the basis that 18 § 922(g)(1) is unconstitutional as applied to him under the Second Amendment. Cecchetelli also moves to suppress the ammunition evidence obtained from execution of a search warrant at 126 Firglade Avenue, Springfield, Massachusetts. Cecchetelli argues that the search was unconstitutional under the Fourth Amendment, as his bedroom constituted a separate "unit" of the residence.

After a non-evidentiary hearing, the Court **DENIES** both Cecchetelli's Motion to Dismiss (Dkt. 75) and Cecchetelli's Motion to Suppress (Dkt. 80).

**FACTUAL BACKGROUND**[1]

Cecchetelli resided in an apartment at 126 Firglade Avenue in Springfield, Massachusetts with his nephew, Michael Cecchetelli ("Michael"). The property is a colonial house with two apartments. Cecchetelli slept in the bedroom (which had a lock on the door), and Michael slept in the dining room. The two shared a kitchen, bathroom, and living room. They paid rent separately to the landlord.

At some point before December of 2019, the government began to investigate Michael, whom it believed to be the East Coast Regional Overseer of the Latin Kings. Through surveillance and cell phone records, the government determined that Michael lived at 126 Firglade Avenue with his uncle, David.

On December 2, 2019, the government applied for a search warrant of 126 Firglade Avenue to recover evidence related to Michael's involvement with the Latin Kings. Magistrate Judge Bowler issued a warrant later that day, authorizing the government to search "all rooms, crawl spaces, storage areas, and any containers such as safes, vaults, file cabinets,

---

[1] The parties stipulated to the facts in the record as undisputed.

drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, and trash cans" and "all areas commonly accessible to the tenants of 126 FIRGLADE AVENUE, SPRINGFIELD, MA, including hallways, basements, attic spaces, storage spaces, driveway, garage, front yard, back yard, and curtilage of the property" for such evidence.  Dkt. 83-3 at 12.

Officers executed the search warrant at approximately 4:00 a.m. on December 5, 2019.  After announcing their presence and entering the property, they observed Cecchetelli emerging from the bedroom and Michael emerging from the rear of the apartment.  Both men were wearing only boxers.

Officers arrested Michael pursuant to the warrant.  At his request, the officers retrieved sweatpants, a shirt, and sneakers from the dining room before transporting him to an FBI location for booking.

Cecchetelli was informed of the search warrant and remained seated on a sofa in the living room.  He chatted with officers, eventually requesting that officers retrieve his glasses, sneakers, and a shirt, all of which were located "right there by [his] bureau in there."  Dkt. 83-1 at 2-3.  When officers searched the room, they discovered four rounds of ammunition under the bed and a loaded firearm with five rounds of ammunition behind a table fan on the bureau.

Cecchetelli pled guilty in 2005 for Gaming Conspiracy in violation of 18 U.S.C. § 371 and Conducting an Illegal Gambling Business in violation of 18 U.S.C. § 1955, crimes punishable by a term of imprisonment of more than one year.  He received an 8-month sentence.  The conviction came out of an investigation into a bookkeeping operation involving Genovese Crime Family members.  Because of Cecchetelli's prior felony conviction, the officers arrested him and charged him with being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).[2]

## DISCUSSION

I.  **Motion to Dismiss**

Cecchetelli first asks the Court to dismiss the indictment on the ground that 18 U.S.C. § 922(g)(1), which prohibits the possession of firearms by convicted felons, is unconstitutional under the Second Amendment as applied to him because he committed the nonviolent felony of sports betting.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court recognized an individual right to

---

[2] Cecchetelli does not face any charges related to possession of the firearm recovered from the bureau because the government lacked proof of the interstate commerce element of that offense.

4

bear arms.  554 U.S. at 635.  Noting that the Court's "first in-depth examination of the Second Amendment" does not "clarify the entire field," the decision at least applies to "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  Id.

Like other rights, the Second Amendment right is "not unlimited."  Id. at 626.  The Court noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among other examples, calling these regulatory measures "presumptively lawful."  Id. at 626–27, 627 n.26. The Court again endorsed the constitutionality of felon in possession measures in McDonald v. City of Chicago, Ill., 561 U.S. 742, 786 (2010) (reiterating that the Heller holding "did not cast doubt" on regulatory measures like felon-in-possession prohibitions and "repeat[ing] those assurances here"). See also Vartelas v. Holder, 566 U.S. 257, 271 (2012) (referencing Heller's approval of felon dispossession laws).

After Heller, the First Circuit—along with every other circuit to consider the issue—has held that § 922(g)(1) does not facially violate the Second Amendment.  See United States v. Torres-Rosario, 658 F.3d 110, 113 (1st Cir. 2011) (collecting cases).  Stating "[i]t is well-established that felons are more likely to commit violent crimes than are other law-abiding

citizens," the First Circuit ventured that after Heller the Supreme court "may be open to claims that some felonies do not indicate potential violence" and "might even be open to highly fact-specific objections." Id. at 113.  The court stressed that this approach "would obviously present serious problems of administration, consistency and fair warning." Id.  Because Torres-Rosario had previously been convicted of two drug offenses and "drug dealing is notoriously linked to violence," the court dispensed with its analysis fairly quickly: "Assuming *arguendo* that the Supreme court might find some felonies so tame and technical as to be insufficient to justify the ban, drug dealing is not likely to be among them." Id.

Cecchetelli contends that the First Circuit would apply intermediate scrutiny to his as-applied challenge, citing United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011).  The government responds that Booker dealt with a different subsection of the statute, and the appropriate standard in this case is still unknown.  Booker considered a facial challenge under § 922(g)(9) to the state misdemeanor offense of domestic violence. Booker, 644 F.3d at 22. Although the government in Booker urged the court to adopt the intermediate scrutiny standard, the court thought it sufficient to conclude: "[A] categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a

substantial relationship between the restriction and an important governmental objective." Booker, 644 F.3d at 25 (citing United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010)). It held that "the categorical regulation of gun possession by domestic violence misdemeanants thus appears consistent with Heller's reference to certain presumptively lawful regulatory measures." Id. See also United States v. Rene E., 583 F.3d 8, 15 (1st Cir. 2009) (discussing the debate among historians about the extent to which the right to bear arms in the founding period turned upon concerns about the possessor's "virtue").

The First Circuit did not explicitly adopt an intermediate scrutiny standard, but the "strong showing" analysis is substantially the same. As stated by the Supreme Court, under the intermediate scrutiny standard, "a statutory classification must be substantially related to an important governmental objective." Clark v. Jeter, 486 U.S. 456, 461 (1988). The "fit" between the statute and the objective need not be perfect, but it must be reasonable. United States v. Marzzarella, 614 F.3d 85, 98 (3d Cir. 2010); Kanter v. Barr, 919 F.3d 437, 448 (7th Cir. 2019).

Congress enacted § 922(g)(1) to "keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." Small

7

v. United States, 544 U.S. 385, 393-94 (2005) (citations omitted). The government cites public safety and crime prevention as important governmental interests. Cecchetelli does not dispute that "it is an important government objective to keep the public safe." Dkt. 75 at 16. He argues, however, that this interest only justifies disarming violent felons, and "[p]erhaps" individuals "convicted of fraud or other serious crimes of deception." Id. He asks "[w]hat important government objective could be served by prohibiting someone who was convicted of a non-violent gaming crime from possessing ammunition?" Id. But recidivism risk and public safety concerns are not limited to those with prior violent convictions.

Courts have upheld the felon ban in as-applied challenges where the individuals sought injunctive relief to restore their Second Amendment rights after being convicted of non-violent felonies. See, e.g., Folajtar v. Att'y Gen. of the United States, 980 F.3d 897, 909 (3rd Cir. 2020) (rejecting an as-applied challenge by an individual convicted of tax fraud and holding there is good reason not to trust felons, even nonviolent ones, with firearms); Kanter, 919 F.3d at 450 (rejecting an as-applied challenge where the prior conviction was mail fraud). Some judges have disagreed. In her dissent in Kanter, then-Judge Barrett wrote "the reasoning that supports

8

the categorical disarmament of violent felons—that past violence is predictive of future violence—simply does not apply." Kanter, 919 F.3d at 467 (Barrett, J., dissenting); see also Folajtar, 980 F.3d at 924 ("Because she is not dangerous, we should not exclude her from her Second Amendment right.") (Bibas, J., dissenting).  However, Cecchetelli has not cited any case where a court has granted an as-applied challenge by an individual with a non-violent felony conviction.

Cecchetelli's case shows the difficulty of making a dangerousness determination as the touchstone for distinguishing between serious and non-serious felonies.  Cecchetelli contends that his prior offense was "the quintessential non-serious crime."  Dkt. 75 at 13.  Yet 18 U.S.C. § 1955 "target[ed] organized criminal groups," and it was "enacted together with RICO as part of the Organized Crime Control Act of 1970."  Boyle v. United States, 556 U.S. 938, 949 (2009).  Cecchetelli's sports gambling operation was linked to organized crime, bringing in around $377,000 in a 25-day period.  The government points out that gambling operations have long been the mainstay of organized crime, and collection of gambling debts is often accompanied by acts of violence.  Even assuming that some sports gaming felonies are so tame, technical, and virtuous as to be outside the scope of the categorical felon ban, Cecchetelli's

9

conviction for illegal gambling operations in connection with organized crime, involves danger to the public.

## II. Motion to Suppress

### A. Legal Standard

"The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized.'" Maryland v. Garrison, 480 U.S. 79, 84 (1987). "A warrant satisfies the particularity requirement if 'the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort' such that no other premise might be mistakenly searched." United States v. McLellan, 792 F.3d 200, 212 (1st Cir. 2015) (quoting United States v. Mousli, 511 F.3d 7, 12 (1st Cir. 2007)).

Generally, "a warrant that authorizes the search of an undisclosed multi-unit dwelling is invalid." McLellan, 792 F.3d at 212 (quoting Mousli, 511 F.3d at 12). If the dwelling is a single-unit residence, however, the warrant "authorizes the search of that entire dwelling regardless of who the area being searched belongs to, so long as the items delineated in the warrant could reasonably be found in the searched area." Id. (citing United States v. Ayers, 924 F.2d 1468, 1480 (9th Cir. 1991); United States v. Canestri, 518 F.2d 269, 273-74 (2d Cir. 1975)); see also United States v. Hinds, 856 F.2d 438, 441 (1st

10

Cir. 1988) (noting that, although "the authority to search must be limited to places described in the warrant," "search warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided").  "Whether a dwelling constitutes a single- or multi-unit residence is a fact-intensive and situation-specific determination, and thus there are no hard-and-fast rules as to what category any particular dwelling falls into."  McLellan, 792 F.3d at 212.  Relevant factors include "1) whether the space opens only into the unit specified in the warrant or instead into a common area or the outside; 2) whether the space is equipped for independent living (e.g., has separate utilities, doorbell, mailbox, bathroom, and kitchen); and 3) whether the occupant of the space has access to the unit specified in the warrant."  United States v. Pimentel, No. 18-cr-10452-PBS, 2019 WL 3767514, at *5 (D. Mass. Aug. 9, 2019) (citing United States v. Ferreras, 192 F.3d 5, 10-11 (1st Cir. 1999)).

**B. Analysis**

Cecchetelli argues that the search violated the Fourth Amendment because the police knew or should have known that his bedroom qualified as a separate "unit" from Michael's living space within the apartment at 126 Firglade Avenue. Cecchetelli emphasizes (1) that the bedroom "had locks" and he kept his bedroom locked "whenever [he] was not at the residence," (2)

11

that "Michael did not have access to" the bedroom when the door was locked, and (3) that Cecchetelli and Michael paid rent to their landlord separately for their rooms.  Dkt. 80-1 ¶¶ 6-8.

Arguing that the warrant authorized the search of Cecchetelli's bedroom, the government points out that Cecchetelli's bedroom was only accessible through common space within the apartment.  There was no separate entrance to the bedroom from the outside.  The bedroom was not equipped for independent living: Cecchetelli and Michael "shared a common kitchen, bathroom, and living room," id. ¶ 5, and there is no indication he and Michael had separate mailboxes, doorbells, or utilities.  When officers entered the residence, the door to Cecchetelli's bedroom was open.

Cecchetelli argues the government knew of (or should have known of) the facts which purportedly establish the existence of separate units.  He highlights the fact that the government had, through surveillance, determined that Michael lived primarily in the dining room area of the property, see Dkt. 83 at 262 ("CW-9 added that [Michael's] primary living space within the apartment is the dining room area.").  Courts must "judge the constitutionality of [officers'] conduct in light of the information available to [the officers] at the time they acted." Garrison, 480 U.S. at 85.  An informant described the apartment as a one-bedroom unit.  See Dkt. 83 at 262 ("CW-9 reported that

12

[Michael] resided in a one-bedroom apartment located on FIRGLADE AVENUE, SPRINGFIELD, MA with his uncle."). When officers arrived on the premises, the door to Cecchetelli's bedroom was open in a manner consistent with Michael having access to the room. Cecchetelli does not assert that he ever told officers during the December 5 search that he kept his bedroom door locked whenever he was not present or that he and Michael paid rent separately.

In similar circumstances, the courts have found that a search was valid even when different areas were occupied by different individuals. See Hinds, 856 F.2d at 441–42 (finding that a search of a bedroom and kitchen on the top floor was included in the warrant, even though occupied by different individuals than the rest of the residence, where "[t]here were no indications, such as separate doorbells or mailboxes, that more than one family lived at 41 Braddock Park" and "the top floor on which the Hinds lived was not separated from the floors below by a door, but was openly accessible to anyone in the house"); cf. Ferreras, 192 F.3d at 11 (finding that an attic above defendant's apartment was included within the warrant to search the apartment where "(1) the attic was open to the second floor, but not to the street or the first-floor apartment; (2) the third floor was not equipped for independent living; and (3) the occupant of the third floor had access to the second-floor

13

kitchen and bathroom"); Garrison, 480 U.S. at 86–88 (search permissible where officers were unaware of the existence of separate units when they began the search and ceased searching defendant's unit once they became aware that the third floor had two apartments).

Because Cecchetelli's bedroom was part of a single unit dwelling at 126 Firglade Avenue, the warrant authorized the search of his room. Moreover, even though the government knew that the nephew's primary living space was the dining room, once they entered there is no evidence they knew or should have known Cecchetelli's bedroom was a separate unit.  The search did not violate Cecchetelli's Fourth Amendment rights.

## ORDER

For the reasons stated above, Cecchetelli's Motion to Dismiss (Dkt. 75) and Motion to Suppress (Dkt. 80) are denied.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge