### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA

Criminal Case No. 3:20CR30008-1

vs.


DAVID CECCHETELLI

---

### DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE AND/OR VARIANCE FROM THE SENTENCING GUIDELINES

---

The Defendant, David Cecchetelli, submits this sentencing memorandum in support of his position on sentencing. Mr. Cecchetelli pled guilty to Count 1 of a single count indictment in this case alleging a violation of 18 U.S.C. § 922(g)(1). The United States Probation Department has calculated Mr. Cecchetelli's advisory guideline range to be 10-16 months. See PSR, ¶ 67. Mr. Cecchetelli also has 64 days of time served on pre-trial detention.    For the reasons set forth in this memorandum, Mr. Cecchetelli requests that this Court impose a sentence of time served representing the 64 days he has been incarcerated in this case. Mr. Cecchetelli has also been on pretrial release throughout the pendency of this case, since it began in 2019. He has complied with all the conditions of his release and probation in all respects. Therefore, given the extended time he has been subject to probation due to the Covid -19 pandemic, Mr. Cecchetelli is seeking to not be subject to probation/supervised release as part of his sentence in this matter.

1

The sentence recommended by Mr. Cecchetelli is one that satisfies the factors set forth in the United States Sentencing Guidelines and 18 U.S.C. § 3553(a) and comports with the requirement that the Court impose the sentence that is "minimally sufficient to achieve the broad goals of sentencing." United States v. Rodriguez, 527 F. 3d 221, 228 (1st Cir. 2008).

Accordingly, Mr. Cecchetelli respectfully requests that this Court adopt and impose his recommended sentence for the reasons set forth herein.

## I.    **Factual Background**

A.    MR. CECCHETELLI'S PERSONAL BACKGROUND

Mr. Cecchetelli was born on October 10, 1967 in Springfield, MA. He was the youngest of four children, two older brothers and an older sister. Mr. Cecchetelli was raised in a stable emotional and economic environment. He was not exposed to any substance abuse or any physical or emotional abuse of any kind as a child. The defendant attended school in Springfield and had many childhood friends in his neighborhood. He graduated from Putnam Vocational High School in 1985. Mr. Cecchetelli enrolled in the Criminal Justice program at Springfield Technical Community College for one semester. In 1986, Mr. Cecchetelli left his childhood home and this supportive environment and enlisted in the United States Navy. Upon returning from the Navy, Mr. Cecchetelli obtained employment with the Hampden County Sheriff's Office as a correctional officer. From 1994-1997, the defendant attended courses at Holyoke Community College. He earned 59 credits prior to withdrawing.  From 1996-1998, Mr. Cecchetelli enrolled himself in Western New England College in Springfield. The defendant ultimately earned 9 additional credits during his time at Western New England College. In 1994, Mr. Cecchetelli married Andrea Stasio. Mr. Cecchetelli and Ms. Stasio  had two children

2

together, daughters Gianna and Alexa. Both of Mr. Ceccetelli's daughters now have a child of their own, making Mr. Cecchetelli a proud and devoted grandfather. Unfortunately, Mr. Cecchetelli's marriage to Ms. Stasio ended in divorce, but the two of them continued to share joint physical custody of both Gianna and Alexa until adulthood. Mr. Cecchetelli remains well liked in the community. Attached, hereto as Exhibit A are letters from his family and members of the community attesting to the good, kind, loving, and caring person that Mr. Cecchetelli is.

B.      MR. CECCHETELLI'S MILITARY SERVICE AND EXPOSURE TO NEUROTOXIC CHEMICALS LEADING TO LIFE-ALTERING HEALTH COMPLICATIONS.

Mr. Cecchetelli made the decision, at a young age, to serve his country in the military and to start his life on a positive path. He enlisted in the United States Navy on February 26, 1986. He was assigned to the USS Cimarron in Honolulu, Hawaii and achieved the rank of Seaman E-3 on March 16, 1987. The defendant was trained in Infantry, Gun Crews, and was given the primary duty of Seamanship Specialist. He was also studying navigation. All was well for Mr. Cecchetelli until October of 1987, when his life would be forever altered. In October of 1987, there was an explosion on the defendant's ship, USS Cimarron. This explosion led to a chemical spill. Mr. Cecchetelli and two other crew members were ordered to clean up this chemical spill. This was a grave mistake, as this chemical was neurotoxic that causes severe and permanent health implications for individuals who are exposed to it. These three crew members suffered immediate effects from the neurotoxic chemical. Mr. Cecchetelli began experiencing weakness in his legs, and he could not keep his eyelids open. The three men were initially brought to the medical center in Honolulu, but given their condition, they were transferred to the Bethesda Naval Hospital in Maryland. Once at the Bethesda Naval Hospital, Mr. Cecchetelli was diagnosed with Ocular Bulbar Myasthenia Gravis. This is a

chronic auto immune disease that presents similar to Multiple Sclerosis. Myasthenia Gravis results in weakness of the voluntary muscles of the body and is caused by a defect in the transmission of nerve impulses to the muscles. The body's immune system attacks the enzyme created by the nerve endings necessary to join with the muscle. This disease is debilitating and forever altered his life. As a result of serving his country, Mr. Cecchetelli was stricken with this disease, and the other two service members did not fare much better. One of these men was diagnosed with Hodgkin's Disease, and the other was stricken with a neurological disease. Mr. Cecchetelli was honorably discharged as a temporary disabled retiree on October 22, 1987. Then in July 1, 1989 he became a permanent retiree. The Veterans Administration awarded Mr. Cecchetelli full medical disability benefits. Mr. Cecchetelli also receives Social Security benefits as a result of this disease. Mr. Cecchetelli now weighs approximately 340 pounds largely due to the complications of this disease limiting his ability to be mobile. This disease has no cure, and Mr. Cecchetelli continues to receive treatment at the VA hospitals in both Springfield and Leeds, Massachusetts.

## C. THE CURRENT OFFENSE

Mr. Cecchetelli pled guilty to Count 1 of a single count indictment alleging a violation of 18 U.S.C. § 922(g)(1), as he was a felon in possession of ammunition. The underlying felony which prohibited Mr. Cecchetelli from possessing ammunition was due to illegal sports gambling. He pled guilty to conducting illegal gambling and conspiracy in 2005. Mr. Cecchetelli's role in this sports gambling operation consisted of taking bets by answering a telephone. He would also occasionally pay and collect wagers from customers. There was no violence or threats of violence associated with Mr. Cecchetelli and this sports gambling venture.

4

On December 5, 2019, at 4am, members of the FBI task force and Springfield Police Department went to 126 Firglade Avenue, first floor, with an arrest warrant for Michael Cecchetelli, David Cecchetelli's nephew. David Cecchetelli had his own bedroom apartment on the first floor of 126 Fireglade Avenue and shared a common kitchen and bathroom with his nephew, Michael, who also had his own bedroom. The FBI was not there for David, and David was not part of the investigation that had been conducted into Michael. David was awake at the time the FBI came to the house. The FBI breached the front door to the premises. David was observed coming out of his bedroom, given the commotion. Officers had David sit, and they began to searching the residence. Eventually, the officers moved to David's room. Upon searching the room, officers found four rounds of ammunition in a box under David's bed and a Smith and Wesson revolver with five rounds of ammunition on the bedroom dresser next to his bed and behind a tabletop fan.

## II.    A DEPARTURE FROM THE ADVISORY GUIDELINES AND/OR A VARIANCE BASED ON THE 18 U.S.C. § § 3553(a) FACTORS IS WARRANTED

The calculation of the applicable advisory Guideline is simply the "starting point and initial bench mark" in the sentencing analysis, which is conducted pursuant to the factors outlined in 18 U.S.C § 3553(a). Gall v. United States, 552 U.S. 38, 49 (2007).  Following the Supreme Court's landmark ruling in United States v. Booker, the Supreme Court held that its Sixth Amendment holdings in Blakely v. Washington, 542 U.S. 296 (2004) and Apprendi v. New Jersey, 530 U.S. 455 (2000) applied to the Federal Sentencing Guidelines. United States v. Booker, 543 U.S. 220, 244 (2005). The Court further held that the provisions of the Federal Sentencing Reform Act of 1984, that make the Guidelines mandatory or which rely upon the Guidelines' mandatory nature, were incompatible with its Sixth Amendment holding. Booker,

543 U.S. at 244. As a result, the Court severed and excised those provisions, "mak[ing] the Guidelines effectively advisory." 543 U.S at 245.

Largely as a result of the Supreme Court's sentencing pronouncements in Gall v. United States, 552 U.S. 38 (2007) and in Kimbrough v. United States, 552 U.S. 85 (2007), the sentencing options available to district court judges have "significantly broadened." United States v. Moon, 513 F.3d 527, 544 (6th Cir. 2008), quoting Gall, 552 U.S. at 59. District courts are now free from any requirement that they mechanically adhere to the tight strictures of the guidelines, nor are courts required to even presume that the guidelines provide an appropriate sentence in a given case.

Recognizing that the guidelines are simply the "starting point" in a sentencing analysis, district courts must delve deeper and make an "individualized assessment based on the facts presented." Gall, 552 U.S. at 50.  In making an individualized assessment, the district court is required to consider all of the factors outlined in 18 U.S.C. § 3553(a) and is permitted to tailor the sentence in light of other statutory concerns. Kimbrough, 552 U.S at 101. A district court may reasonably determine that a within guidelines sentence does not serve the objectives of sentencing, even if that determination ultimately rests on a disagreement with the guidelines. Kimbrough, 552 U.S. at 91. See United States v. Pugh, 515 F.3d 1179, 1190–91 (11th Cir. 2008).

The goal of performing an individualized sentencing assessment is to arrive at a just sentence, one "sufficient, but not greater than necessary," 18 U.S.C.A. § 3553(a), to serve the purposes of sentencing set forth in § 3553(a)(2). United States v. McBride, 511 F.3d 1293, 1297 (11th Cir. 2007). The sentencing court is "free to conclude that the applicable guideline range

gives too much or too little weight to one or more factors, either as applied in a particular case or as a matter of policy." United States v. Campos-Maldanado, 531 F.3d. 337 (5th Cir. 2008).

A district court must give respectful consideration of the guidelines in determining a sufficient sentence, Gall, 552 U.S. at 46, but it may not presume that the guideline sentence is the correct one. Rita v. United States, 551 U.S. 338, 351 (2007). The court is free to consider whether the guideline sentence itself "fails to properly reflect § 3553(a) considerations" in the case at hand, Rita, 551 U.S. 338. at 351, and/or whether the guidelines at issue exemplify the Sentencing Commission's "exercise of its characteristic institutional role." Kimbrough, 552 at 109. The First Circuit has directed sentencing courts to contemplate the "tapestry of factors" set forth in 18 U.S.C. § 3553(a) in determining the sentence that is "*minimally sufficient* to achieve the broad goals of sentencing." United States v. Rodriguez, 527 F.3d 221, 228 (1st Cir. 2008) (emphasis added).

In relevant part, 18 U.S.C. § 3553(a) directs this Court to consider, at sentencing, in addition to the advisory guidelines, the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed, the kinds of sentences available, any pertinent policy statement, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. The Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2), which are "the need for the sentence imposed  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

1.    DEPARTURE PURSUANT TO BOTH U.S.S.G. § 5H1.11 AND U.S.S.G § 5H1.4 AND/OR A VARIANCE BASED ON THE § 3553(A) FACTORS IS WARRANTED BASED ON THE COMBINATION OF MR. CECCHETELLI'S MILITARY SERVICE, RESULTING PHYSICAL CONDITION AND COVID-19

As directed by the relevant case law, the Court should calculate the advisory guideline with consideration of the policy statement described in U.S.S.G. § 5H1.11, in regard to the analysis of Specific Offender Characteristics. This policy statement is entitled "Military, Civic, Charitable, or Public Service; Employment-Related Contributions; Record of Prior Good Works". Mr. Cecchetelli's military service is relevant to a departure in this case. However, it is not Mr. Cecchetelli's military service alone that should be considered but his military service in combination with his physical condition that resulted from his military service. As will be further discussed herein, Mr. Cecchetelli's resulting physical condition leaves him particularly susceptible to severe Covid-19 infection, especially in a communal environment. As seen in the policy statement in U.S.S.G. § 5H1.4 a defendant's physical condition may be relevant in determining whether a departure is warranted. Mr. Cecchetelli's physical condition presents to an unusual degree and distinguishes his case from the typical cases covered by the guidelines. As a result of his military service, Mr. Cecchetelli was exposed to a neurotoxic chemical after an explosion on his ship. Mr. Cecchetelli and the other two crewman, who were exposed, all suffered life-altering health issues. Mr. Cecchetelli was diagnosed with Myasthenia Gravis as a result of this exposure. As discussed above, this is a chronic auto immune disease that presents similar to Multiple Sclerosis. Myasthenia Gravis results in weakness of the voluntary muscles of the body and is caused by a defect in the transmission of nerve impulses to the muscles. The

body's immune system attacks the enzyme created by the nerve endings necessary to join with

the muscle. This disease is debilitating and forever life-altering. As a result of being debilitated

due to this disease, Mr. Cecchetelli's ability to move and exercise has been significantly

impaired. As such, he has put on a significant amount of weight resulting in his becoming obese.

He currently weighs approximately 340 pounds. This combination of factors, along with the

Covid-19 pandemic still impacting this country, takes Mr. Cecchetelli's case outside the

heartland of the guidelines and warrants departure. The relevant test in regard to departures

based on physical impairments is as follows:

> To determine if an extraordinary physical impairment exists, as may warrant a variance
> from the sentencing guidelines range, the sentencing court asks: first, whether the
> particular defendant's physical condition is such that he or she would find imprisonment
> more than the normal hardship; second, whether imprisonment would subject him or her
> to more than the normal inconvenience or danger; and third, whether the physical
> condition has any substantial present effect on the defendant's ability to function.

United States v. Charles, 531 F.3d 637 (8th Cir. 2008).

In terms of Mr. Cecchetelli's current physical condition, he meets every aspect of this test.

Imprisonment would be more than a normal hardship for Mr. Cecchetelli; he would be in a

confined and communal environment exacerbating the restrictions on his movement; most

significantly, however, is the danger that prison will subject Mr. Cecchetelli to if incarcerated.

With the Covid-19 pandemic still occurring in this country, and with cases on the rise, Mr.

Cecchetelli, being placed in a communal setting, in close quarters with others, will expose him to

a danger not experienced by other inmates. Mr. Cecchetelli's physical condition leaves him at

increased risk for severe Covid-19 infection and adverse outcomes. Mr. Cecchetelli is obese, has

the autoimmune condition Myasthenia Gravis, and takes immunosuppressant medication to treat

his Myasthenia Gravis. This medication is called Mycophenolate Mofetil. This medication has

the side effect of lowering Mr. Cecchetelli's immune system making it more difficult for his body to prevent and fight infection. In fact, there has been recent medical research done on the risk of severe covid-19 infection on those patients taking immunosuppressant drugs, specifically Mycophenolate Mofetil. See Epidemiological pattern, incidence, and outcomes of COVID-19 in liver transplant patients August 1, 2020 (attached hereto as Exhibit B).[1] The study concluded "Baseline immunosuppression containing mycophenolate was an independent predictor of severe COVID-19". In another study, we find similar conclusions that science has been able to determine that Mycophenolate Mofetil causes an impaired immune response to Covid-19 vaccination. See Intensity of mycophenolate mofetil treatment is associated with an impaired immune response to SARS-CoV-2 vaccination in kidney transplant recipients November 1, 2021, (attached hereto as Exhibit C).[2] Not only is the medication that Mr. Cecchetelli must take opening him up to the real risk of being severely impacted by Covid-19, but this medication also makes vaccination less effective in preventing Covid-19 or reducing the infection's severity. In still other studies, just having Myasthenia Gravis places patients at increased risk of severe outcomes and prolonged hospitalization. See Impact of COVID-19 infection among myasthenia gravis patients- a Cerner Real-World DataTM study January 27, 2022, (attached hereto as Exhibit D).[3] Mr. Cecchetelli doesn't just have Myasthenia Gravis but has an additional comorbidity due to his obesity. The CDC has warned that obesity places Mr. Cecchetelli at

---

[1] This study may also be found at: https://www.journal-of-hepatology.eu/article/S0168-8278(20)30521-3/fulltext

[2] This study may also be found at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8653081/

[3] This study may also be found at: https://bmcneurol.biomedcentral.com/articles/10.1186/s12883-022-02564-x

increased risk of severe illness if he were to catch Covid-19. The CDC warns that obesity may

triple the risk of hospitalization during Covid-19. In addition, the CDC states that obesity

decreases lung capacity and reserve and can make ventilation more difficult. The CDC further

cites a study of COVID-19 cases suggesting that risks of hospitalization, intensive care unit

admission, invasive mechanical ventilation, and death are higher with increasing BMI. The

increased risk for hospitalization or death was particularly pronounced in those under age 65. See

CDC advisory on Obesity, Race/Ethnicity, and COVID-19, (attached hereto as Exhibit E).[4]

Certainly the risk of danger to Mr. Cecchetelli, in a sentence that includes incarceration, is more

than a normal inmate and places his situation outside the heartland of the guidelines.

Even if the Court were to determine that Mr. Cecchetelli does not qualify for a departure

under the rigid application of the Guidelines and its associated policy statement, as noted above

in Booker, Kimbrough, Rita, and Gall, the Court is not bound by the Guidelines and instead

makes an individualized assessment based on the factors presented and must consider all the

factors outlined in 18 U.S.C. § 3553(a). The Court is free from any requirement to mechanically

adhere to the guidelines, and the Court is not required to presume that the Guidelines provide an

appropriate sentence in a given case. The Court may reasonably determine that a within

guidelines sentence does not serve the objectives of sentencing, even if that determination

ultimately rests on a disagreement with the guidelines. Kimbrough, 552 U.S. at 91.  Given the

record before the Court of Mr. Cecchetelli's serious health issues that resulted from his military

service to this county, the Court should weigh this heavily when balancing the 3553(a) factors,

---

[4] This CDC advisory may also be found at: https://www.cdc.gov/obesity/data/obesity-and-covid-19.html

especially in regards to 3553(a)(1) "…the history and characteristic of the defendant" and determine that a variance to a sentence of time served is justified for Mr. Cecchetelli.

2.      ADDITIONAL FACTORS TO BE CONSIDERED IN THE § 3553(A) ANALYSIS

In applying the § 3553(a) factors, in addition to Mr. Cecchetelli's serious health issues, there are a number of considerations that would warrant the Court to utilize its discretion and find that a sentence of time served is appropriate.

In terms of § 3553(a)(1), regarding the "history and characteristics" of Mr. Cecchetelli, it is important to consider the aberrational nature of the conduct here. As stated previously, Mr. Cecchetelli was a felon because approximately 17 years ago he was involved in sports gambling. There is no record of any violence associated with Mr. Cecchetelli and the sports gaming he was convicted of in 2005. Mr. Cecchetelli has no record of violence and is not a violent person. Sports gaming is now being legalized across the country, and countless law-abiding citizens engage in it every day. The history of Mr. Cecchetelli has not been of a criminal, but rather a law-abiding citizen. This offense is an aberration in an otherwise mostly law abiding life and should be given weight in the § 3553(a) sentencing analysis. Another factor to consider regarding the "history and characteristics" of Mr. Cecchetelli under § 3553(a)(1) is his motive in committing the instant offenses, as a defendant's motive is highly relevant at sentencing. Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993). Mr. Cecchetelli is a permanently disabled veteran, who has serious health issues as a result of his service and is obese. He had the firearm for home defense given his impaired physical condition and living in a bad neighborhood. This firearm and ammunition were found on his nightstand next to his bed where he had been sleeping. This is not a case of a felon walking around the streets with a firearm, or someone who is involved in a shooting or violence of any kind. While it is still a crime, it is understandable

12

that a person who is permanently disabled would want to have a firearm in their home when living in a bad neighborhood for their personal protection. The motive here was personal protection of a disabled veteran, and, as such, it should be considered when balancing the § 3553(a) factors.

An analysis under § 3553(a)(2), regarding the need for the sentence imposed, illustrates that a sentence of time served is appropriate in this case. When balancing the § 3553(a)(2) factors, weight should be given to the specific circumstances of Mr. Cecchetelli's situation, as it relates to  § 3553(a)(2)(A) to reflect the "seriousness of the offense" and "to provide just punishment for the offense", § 3553(a)(2)(B) the need for "adequate deterrence", and § 3553(a)(2)(C) "to protect the public from further crimes of the defendant".  As indicated previously, Mr. Cecchetelli has lived a largely law-abiding life save for a felony he received for sports gaming 17 years ago, so his conviction in this case is an aberration. When balancing the § 3553(a)(2)(A) factors, this offense is just not the most serious. As discussed previously, the offense is that a disabled veteran with serious health issues had a firearm in his home for personal protection in a bad neighborhood. Further, while he was a prohibited person, his felony conviction was for sports gaming a non-violent offense. Given recent developments in Second Amendment jurisprudence, it is very possible that at some point in the future Mr. Cecchetelli will no longer be considered a prohibited person. See United States v. Torres-Rosario, 658 F.3d 110, 113 (1st Cir. 2011) ("…given the "presumptively lawful" reference in Heller—the Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban."); see also Binderup v. Attorney General United States of America, 836 F.3d 336 (3d Cir. 2016).

.

When analyzing if time served is sufficient when balancing § 3553(a)(2)(B) the need for "adequate deterrence", and § 3553(a)(2)(C) "to protect the public from further crimes of the defendant", it is important to look at Mr. Cecchetelli's characteristics and compare him to other similarly situated offenders. Mr. Cecchetelli's history and characteristics make him a low risk to re-offend. According to the United States Sentencing Commission, recidivism rates in general (defined to include technical, supervised, release violations) "decline relatively consistently as age increases," from 35.5% for offenders under 21, down to 12.7% for offenders age 51 to 50, and down to 9.5% for offenders over age 50. U.S. Set'g Comm'n *Measuring Recidivism* at 12 & Exh.9.[5] In fact, this percentage declines even further to 6.2% for defendants over 50 and with a Criminal History Category of I, as is the case with Mr. Cecchetelli. <u>Id</u>. at Exh.9. Of all defendants in all criminal history categories, those over 50, with a Criminal History of I, were the least likely to experience recidivism. <u>Id</u>. The Commission's research also demonstrates that employment and family ties and responsibilities all predict reduced recidivism, U.S. Sent'g Comm'n, *Measuring Recidivism* at 12 & Exh. 10. Mr. Cecchetelli has been on probation now since 2019. While he was incarcerated, he has spent most of his time awaiting trial and sentencing on pre-trial release/probation. In further support of a sentence to a term of time served, the United States Sentencing Commission found that, of all forms of sentencing available (other than a fine-only sentence), those offenders sentenced to a term of probation only were the least likely to recidivate. U.S. Sent'g Comm'n, *Measuring Recidivism* at 13 & Exh.12. Given Mr. Cecchetelli's age and strong family support, and time spent on pre-trial release/ probation, the conclusion that he is most unlikely to re-offend is strongly supported.

---

[5] This research from the United States Sentencing Commission is available at:
https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelines

Courts are required to consider all of "the kinds of sentences available" by statute, §

3553(a)(3), even if the "kinds of sentence...established by the guidelines" zones recommend

only a lengthy prison term. <u>United States v. Gall</u>, 552 U.S. at 59 & n.11. Congress issued this

directive in the belief that "sentencing decisions should be designed to ensure that prison

resources are, first and foremost, reserved for those violent and serious criminal offenders who

pose the most dangerous threat to society" <u>Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984)</u>

<u>(set forth at 18 U.S.C. § 3551 note)</u>.


**III.   CONCLUSION**

For the foregoing reasons, Mr. Cecchetelli respectfully submits that a sentence of time

served is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. The

offense that Mr. Cecchetelli committed does not carry a mandatory minimum term. As the

guidelines are now advisory, this Court is not constrained from imposing an individualized

sentence.


Respectfully Submitted,
DAVID CECCHETELLI,
By His Attorney,


/s/ Daniel C. Hagan, Jr.
_____
Daniel C. Hagan, Jr., Esq.
33 Mulberry Street
Springfield, MA 01105
413-733-0770 phone
413-733-1245 fax
BBO No.: 674936

## CERTIFICATE OF SERVICE

I, Daniel C. Hagan, Jr., Esq. hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 13, 2022.

/s/ Daniel C. Hagan, Jr.

Daniel C. Hagan, Jr., Esq.
33 Mulberry Street
Springfield, MA 01105
413-733-0770 phone
413-733-1245 fax
BBO No.: 674936